# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| LM INSURANCE CORPORATION, ) | |
| ) | |
|    Plaintiff, ) | |
| ) | |
|            v. ) | |
| ) | |
| FED EQUITIES, INC., MERR, INC., ) | |
| AFFILIATED INSURANCE ) | Case No. 05 C 1154 |
| AGENCY, INC., AND ROBERT ) | |
| GRIMM, ) | Judge Joan B. Gottschall |
| ) | |
|    Defendants/Third-Party Plaintiffs, ) | |
| ) | |
|            v. ) | |
| ) | |
| SOURCEONE GROUP, INC., ) | |
| ) | |
|    Third-Party Defendant/Counterclaimant ) | |

## MEMORANDUM OPINION AND ORDER

Third party defendant SourceOne Group, Inc. ("SOG") has filed a counterclaim against defendants Fed Equities, Inc. ("Fed Equities"), Merr, Inc. ("Merr"), Affiliated Insurance Agency, Inc. ("AIA"), and Robert Grimm ("Grimm") (collectively "AIA/Merriman") alleging negligence. Presently before the court is the defendants' motion for summary judgment on SOG's counterclaim. For the reasons set forth below, defendants' motion for summary judgment with respect to defendants Merr and Grimm is denied, and defendants' motion for summary judgment with respect to defendants Fed Equities and AIA is granted.

1

# I. BACKGROUND

Third party defendant SOG is a professional employer organization (a "PEO"). PEOs typically provide human resources-related services to their client companies; such services typically include benefits and payroll administration, as well as procuring insurance. Since PEOs may represent several different clients involved in a similar line of business, they may receive favorable group rates, a savings that they can then pass on to their clients. In late 2002, SOG was the PEO for several minor league sports franchises, including the Quad City Mallards (hockey), Rockford Ice Hogs (hockey), and Georgia Force (arena football). SOG, through its then-insurance broker, the DuPre Agency of California, had obtained a workers' compensation insurance policy, no. WC5-34535147-012 (the "012 policy"), with plaintiff Liberty Mutual Insurance Corp. ("LM"). All Illinois companies are required by statute to provide workers' compensation, and this requirement is typically satisfied via the acquisition of a workers' compensation insurance policy. *See generally* 820 ILCS § 305/1, *et seq*.

In or about January 2003, SOG decided to switch insurance brokers from the DuPre Agency to AIA/Merriman. Robert Grimm, AIA/Merriman's president, was informed that the 012 policy's "producer of record" (the broker acting as agent for the insured) could not be changed mid-policy. Grimm therefore attempted a "cancel and re-write" of the policy, by which means the 012 policy would be cancelled and a new policy would be issued with broker AIA/Merriman as the producer of record. Documents canceling the 012 policy were prepared at the end of February 2003, and on March 13, 2003 an application for new coverage was submitted by AIA/Merriman to the National

Council on Compensation Insurance's Assigned Risk Plan (the "Assigned Risk Plan").[1] Grimm believed that the re-issued policy would also be assigned to LM; however, the policy was assigned instead to the Travelers Indemnity Company (the "Travelers"), which issued a policy (the "Travelers policy") covering SOG's then-current client companies' workers' compensation claims.

At approximately the same time, SOG was entering into negotiations to provide workers' compensation insurance for Arena Football 2 Operating Co. LLC ("AF2"). AIA/Merriman allegedly attended a meeting with representatives of SOG in January 2003, specifically so that SOG could have an expert opinion as to what types of risks it might be exposed to with a client such as AF2. SOG intended that the policy covering AF2 would be endorsed onto the 012 policy that covered the other minor league teams that were then SOG's clients. On March 10, 2003, SOG entered into a Client Service Agreement (the "CSA") with AF2, agreeing, *inter alia*, to provide workers' compensation insurance for AF2. SOG intended to have AF2 endorsed onto the 012 policy, and Grimm, who believed that the re-issued policy would be assigned to LM, had issued a certificate of insurance showing coverage for AF2 with LM. However, when the policy was assigned to Travelers, Grimm re-issued a new certificate, stating that AF2 was instead covered by the Travelers policy.

The Travelers policy erroneously listed "Source One Group" as an insured and, presumably as a result, the 012 policy was not cancelled. Thus SOG had two workers' compensation policies in place: the prior 012 policy (in which all of the minor league

---

[1] Companies that are unable to independently obtain workers' compensation insurance coverage may apply to the Assigned Risk Plan which then assigns an insurer from the risk pool. All insurance companies licensed to provide workers' compensation insurance in Illinois must participate in the risk pool.

3

teams, but not AF2, were insured) and the Travelers policy (which, in due course, included AF2 as an insured).

Eventually, the administrator of the Assigned Risk Plan became aware of the fact that both the 012 policy and the Travelers policy improperly covered the same workers' compensation risk. Consequently, on May 27, 2003, the administrator instructed Travelers to cancel the Travelers policy to allow LM to maintain its senior policy in effect, and to transfer any claims against Travelers to LM.[2] AF2, which was not listed as an insured under the 012 policy, was therefore without workers' compensation insurance coverage. SOG and LM consequently began negotiations by which AF2 could be endorsed onto the 012 policy as an insured.

Unlike other insurance policies, both the 012 policy and the Travelers policy list only an "estimated" premium along with the means by which the actual premium is to be calculated; it is the latter amount that the client is bound by the policy to pay. The actual premium is determined by a number of factors. Initially, an audit of the company's payroll assigns the amount paid to various classes (codes) of covered employees, as well as the specific premium assigned to each code depending upon its risk (e.g., a franchises' arena football players are more likely to be injured than its office workers). The rates are thus determined by applying the premium rate for a given code to the amount of payroll assigned to that code. For this reason, insurers frequently conduct an audit of an insured to determine the accuracy of the assignment of the payroll to the various covered codes.

The calculated premium rates are then subject to an "experience modification factor" (the "experience modifier") which is a multiplier assigned to the premium based

---

[2] It appears that, at the time, the administrator believed that both the Travelers policy and the 012 policy covered substantially identical risks and failed to realize that the Travelers policy covered workers' compensation claims of AF2, whereas the 012 policy did not.

4

on the payroll audit, and which adjusts the premium based on the likelihood of that particular class of employer submitting claims against the insurer and the amount of those claims. At his early meetings with SOG, Grimm calculated that the "experience modifier" for AF2 would be 1.0 if it were endorsed onto SOG's policy.

After the Traveler's policy was canceled, Neil Johnson ("Johnson") of LM told SOG that he would require payroll information and a calculated premium "up front" before he would endorse AF2 onto the 012 policy. Consequently, on July 22 and 29, 2003, a partial audit of AF2 was conducted and a payroll of $3.9 million was determined. Furthermore, according to Johnson, the experience modifier to be applied to the premium was not 1.0, but rather 2.41.[3] On July 25, 2003, an agreement was allegedly reached between Johnson and David Stone ("Stone") (legal counsel for SOG) which set forth a payroll based premium of $648,000 and an experience modifier of 2.41, for a total premium of $1,929,342.50.

Negotiations between LM and SOG (with the alleged intermediary assistance of AIA/Merriman) continued through July and August, 2003. These negotiations resulted in a letter proposing an agreement between SOG and LM. The letter, dated August 28, 2003 (the "August 28 letter"), was signed by Brian Bonar ("Bonar"), CEO of SOG, and purported to confirm an understanding between SOG and LM and to "supplement the terms and conditions of the policy and agreement reached between SOG and LM on or about July 25, 2003." The letter establishes a premium of $1,929,342.50 in exchange for the AF2 endorsement and sets out a payment schedule. Upon receipt of the August 28

---

[3] SOG's experience modifier was 1.0; however AF2's experience modifier was allegedly between 2.41 and 2.6. The rule determining the applicable experience modifier states that the experience modifier to be applied to a given policy is that of the insured if the insured's experience modifier is greater than 1.5 times the experience modifier of the PEO.

5

letter, Johnson made some handwritten edits to his copy of the letter, changing and adding certain language and initialing each of his changes.[4] Johnson signed his amended letter and sent copies to both AF2 and SOG's claim management provider, and also left Bonar a voicemail, allegedly informing him of the changes and stating that he would sign a final version of the letter incorporating his changes.

On September 3, 2003, SOG wired a payment of $1.1 million to LM as per the payment schedule set forth in the August 28 letter. The following day, LM cancelled the 012 policy and issued a new policy, no. WC5-34S-351417-022 (the "022 policy"), which endorsed AF2 coverage along with the other minor league teams. LM characterized the 022 policy as a "rewrite" of the 012 policy, because its internal administrative system allegedly prohibited LM from endorsing AF2 onto the 012 policy. On September 4, 2003, LM began paying on AF2's workers' compensation claims. However, on September 28, 2003, LM informed SOG that it was canceling the 022 policy due to SOG's failure to cooperate with LM in conducting an audit of the payroll under the 022 policy.[5] LM allegedly wished to continue to attempt to obtain SOG's cooperation in conducting an audit. Nevertheless, on September 30, 2003 (the date the first payment from SOG was due), Bonar sent a letter to Johnson purporting to provide "formal notice to cancel the unauthorized endorsement of [AF2] to [SOG's] policy of workers' compensation coverage." LM subsequently filed suit against SOG, alleging, *inter alia*, breach of contract, specific performance, promissory estoppel, unjust enrichment, negligent misrepresentation, fraud and fraudulent inducement, and conversion and

---

[4] Johnson changed the word "policy" to "endorsement"; changed the portion of the letter that read "total premium of approximately $1.9 million" to read "estimated premium of $1.9 million" and added language stating that both SOG and Bonar guaranteed the payments "jointly and severally."
[5] Apparently, LM had been unsuccessfully attempting to conduct a second audit of AF2's payroll throughout July and August 2003.

6

constructive trust. *See* Case No. 04-C-0618 (filed Jan. 27, 2004). LM also filed separately the instant suit against the defendants, alleging breach of contract, malpractice, negligent misrepresentation, negligent omission, conversion, and constructive trust. The defendants in turn filed a third party complaint against SOG, seeking contribution and indemnity. SOG subsequently filed a counterclaim against the defendants, alleging negligence on the part of the defendants. Presently before the court is the defendants' motion for summary judgment on its SOG's counterclaim.

## II. ANALYSIS

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether there is a genuine issue of fact, the court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette,* 359 F.3d 925, 928 (7th Cir. 2004). To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

1. Defendants Merr and Grimm

SOG alleges that Merr and Grimm were negligent in failing to determine the proper experience modifier prior to SOG's entry into the CSA with AF2. According to SOG, price considerations were paramount in its determination to enter into the CSA, and Grimm allegedly represented to SOG in January 2003 that the applicable experience modifier would be that of SOG (1.0), rather than that of AF2 (2.41-6.0). SOG contends that it was not until June or July 2003, well after the CSA was signed, that SOG learned that the rule requiring that AF2's higher experience modifier would be applied by LM. SOG argues that Merr and Grimm could have determined the proper experience modifier by simply telephoning the Michigan Insurance Bureau or the National Council on Compensation Insurance ("NCCI") but failed to do so, and instead accepted the representations of a claims management firm familiar with AF2 (Thilman and Filippini) that AF2's experience modifier was 1.0.

Moreover, SOG alleges that Merr and Grimm failed in their duty to obtain insurance coverage for AF2. SOG contends that Merr and Grimm failed to ensure that AF2 was covered under the new policy issued by the Travelers. AF2 was not, in fact, covered until the 022 policy was issued by LM in September 2003, almost six months after the CSA was entered into by AF2 and SOG. SOG claims again that, because of Merr and Grimm's initial negligence in determining AF2's proper experience modifier and because of their failure to endorse AF2 onto the existing 012 policy, SOG was faced with a 241% increase in the expected insurance premiums. Finally, SOG alleges that Grimm and Merr were negligent in failing to inform LM that SOG was searching for alternative insurance coverage during the time that SOG and LM were involved in the

negotiations over what became the 022 policy. According to SOG, this failure goes to the issue of whether or not SOG did in fact accept Johnson's amendments to what became the 022 policy, which is the basis, in another suit, of LM's claims against SOG for, inter alia, breach of contract. SOG claims that Merr and Grimm were the conduit between SOG and LM in August, 2003, and that Merr and Grimm, as SOG's broker, had a duty to inform LM of SOG's negotiating position.

Merr and Grimm admit that the incorrect experience modifier was provided to SOG, but assert that they had no reason to believe that the experience modifier supplied by Thilman and Filippini was incorrect. Moreover, Merr and Grimm claim that they were unable to obtain the information from NCCI because "they did not have the ability to order NCCI mods." Merr and Grimm also argue that SOG did not rely upon Merr and Grimm to perform due diligence prior to, or after, entering the CSA with AF2. According to Merr and Grimm, SOG was unconcerned about the experience modifier because it relied upon the terms of the CSA itself. Section 5.3 of the CSA reads in part: "Client [AF2] warrants that the audit information, classification codes and experience modification information provided is complete and accurate and that no information is omitted that would, by its omission, cause such information to be misleading." Therefore, argue Merr and Grimm, SOG relied solely upon the representations made by AF2 (and via Thilman and Filippini) in determining the applicable insurance modifier.

Merr and Grimm also deny that they had a duty to inform LM that SOG was seeking alternate insurance coverage while negotiations with LM were ongoing in the summer of 2003. Merr and Grimm argue that this is so because they were not involved in the attempt to procure alternate coverage and because SOG was considering, but did not

actually intend, to attempt to procure coverage from an alternative insurer. Finally, Merr and Grimm argue that SOG was not compelled to use the 2.41 experience modifier, but that rather this was the bargaining position taken by Johnson and LM.

Both sides concede that Merr and Grimm, d/b/a AIA Merriman, had agreed to act as SOG's insurance broker during the events in question. The relationship between an insurance broker and the insured is a fiduciary one. *Kanter v. Deitelbaum*, 648 N.E.2d 1137, 1139 (Ill. App. Ct. 1995). In particular, an insurance broker has a fiduciary duty to exercise competence and skill when rendering the service of procuring insurance. *Shults v. Griffin-Rahn Ins. Agency, Inc.*, 550 N.E.2d 232, 234 (Ill. App. Ct. 1990); *see also Miller's Blasting Service, Inc. v. Texas AGA, Inc.*, No. 99 C 50246, 2003 WL 21058344, at *6 (N.D. Ill. May 9, 2003) (Illinois places a "particular burden" on an insurance broker to exercise competence and skill in rendering services). Moreover, "if the principal suffers damage by reason of any mistake or act of omission or commission of the [broker] which constitutes a breach of duty to his principal, he is liable to his principal for any loss he may have sustained thereby." *Economy Fire & Cas. Co. v. Bassett*, 525 N.E.2d 539, 544 (Ill. App. Ct. 1988) (quoting *The Evan L. Reed Manufacturing Company v. Wurts*, 187 Ill.App. 378, 385 (Ill. App. Ct. 1914)). Therefore, Merr and Grimm owed a fiduciary duty of skill and competence to SOG.

SOG claims that Merr and Grimm were negligent in failing to inform SOG of the correct experience modifier for AF2; Merr and Grimm retort that they were under no obligation to do more than rely upon the information that they were given by AF2 via Thilman and Fillipini. This presents a genuine issue of material fact. A reasonable jury could find that the requisite standard of care for a competent and skillful insurance broker

would require that it correctly determine the applicable experience modifier when attempting to procure a policy for a client, and that Merr and Grimm breached that standard by failing to do so. Indeed, a reasonable jury might find that Merr and Grimm breached their fiduciary duty of competence and skill by dint of being unaware of the rule dictating whether SOG's or AF2's experience modifier would govern the determination of the insurance premium. The court therefore denies the defendants' motion for summary judgment with respect to Merr and Grimm.

2. Defendants Fed Equities and AIA

Defendants next argue that Fed Equities and AIA, which are shareholders of Merr (d/b/a AIA/Merriman) are not liable for any claims by SOG against Merr or Grimm. A corporation is a legal entity that exists separately and distinctly from its shareholders, officers, and directors, who are generally not liable for the corporation's debts. *Fontana v. TLD Builders, Inc.*, 840 N.E.2d 767, 775 (Ill. App. Ct. 2005).[6] A primary purpose of doing business as a corporation is to insulate stockholders from unlimited liability for corporate activity. *Peetoom v. Swanson*, 778 N.E.2d 291, 294 (Ill. App. Ct. 2002). Limited liability will ordinarily exist even though the corporation is closely held or has a single shareholder. *Peetoom*, 778 N.E.2d at 294. However, a court may disregard a corporate entity and pierce the veil of limited liability where the corporation is merely the alter ego or business conduit of another person or entity. *Id.* at 294-95.

SOG has adduced no facts contesting that Fed Equities or AIA are shareholders of Merr, nor has it pointed to any activities suggesting that AIA/Merriman's corporate veil should be pierced. Nor does SOG contest, in its responsive brief, defendants' assertion that, as shareholders of Merr, they are shielded from liability for Merr or Grimm's acts.

---

[6] The parties have mutually agreed that Illinois law controls in this case.

Indeed, it fails to address this issue entirely. The court finds, therefore, that there is no genuine issue of material fact concerning Fed Equities' or AIA's liability, and accordingly grants summary judgment in favor of defendants Fed Equities and AIA.

### III. CONCLUSION

For the reasons set forth above, the court denies defendants' motion for summary judgment with respect to defendants Merr and Grimm, and defendants' motion for summary judgment with respect to defendants Fed Equities and AIA is granted.

ENTER:

/s/ ____
JOAN B. GOTTSCHALL
United States District Judge

DATED: March 27, 2008